IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA16-878

Filed: 15 August 2017

Watauga County, No. 14 CVS 625

ANDREA MORRELL, G. PONY MORRELL, and THE PASTA WENCH, INC.,
Plaintiffs,

v.

HARDIN CREEK, INC., JOHN SIDNEY GREENE, and HARDIN CREEK
TIMBERFRAME AND MILLWORK, INC., Defendants.


Appeal by Plaintiffs from order entered 27 April 2016 by Judge William

Coward in Watauga County Superior Court. Heard in the Court of Appeals 22 March

2017.


*Capua Law Firm, P.A., by Paul A. Capua and Genevieve A. Mente, for Plaintiff-Appellants.*

*Wall Babcock LLP, by Joseph T. Carruthers and Lee D. Denton, for Defendant-Appellees.*


HUNTER, JR., Robert N., Judge.

Andrea Morrell ("Andrea"), G. Pony Morrell ("Morrell"), and The Pasta Wench,

Inc. ("The Pasta Wench") (collectively "Plaintiffs") appeal the 27 April 2016 order by

Judge William Coward granting summary judgment in favor of Hardin Creek, Inc.

("Hardin Creek"), John Sidney Greene ("S. Greene"), and Hardin Creek Timberframe and Millwork, Inc. ("Timberframe") (collectively "Defendants"), and dismissing Plaintiff's third party complaint against John Ellis Greene ("E. Greene") with prejudice. After review, we reverse the trial court's order and remand for further proceedings.

## I. Facts and Background

Plaintiffs' forecast of the evidence tends to show the following. Andrea and Morrell are the founders and officers of The Pasta Wench. The Pasta Wench manufactures and distributes "specialty food products including homemade, organic raviolis and other pasta products." Hardin Creek is a commercial landlord. Timberframe is a timber manufacturing and construction company that builds and remodels residential and commercial buildings. S. Greene is the president of Hardin Creek, and the general contractor for Timberframe. E. Greene is S. Greene's father and owner of the property in question.

Andrea and Morrell started The Pasta Wench in April 2010. After experiencing success in local markets in Boone, North Carolina, Plaintiffs expanded to distribute their product across western North Carolina. Plaintiffs later contracted with Harris Teeter for regional distribution across North and South Carolina.

On 2 February 2011, Plaintiffs entered into a commercial lease ("the lease") with Hardin Creek for two units of a steel building located in Boone ("the premises"). Plaintiffs operated their business from the premises, and used the units as a kitchen and a pasta drying room. The lease contained several provisions concerning Plaintiffs' responsibility to obtain liability and property insurance and to indemnify Hardin Creek for damages. The relevant lease paragraphs are as follows:

> 5. Alterations. . . .
> . . . .
>
> (b) Tenant's Neglect. Subject to the provisions set forth in the following sentence, Tenant shall pay for the cost of any repairs or damage resulting from negligence or the wrongful acts of his employees, representatives or visitors. However, and notwithstanding any other provision of this lease to the contrary, Landlord and Tenant and all parties claiming under them agree and discharge each other from all claims and liabilities arising from or caused by any hazard covered by insurance on the leased premises, or covered by insurance in connection with the property owned or activities conducted on the leased premises, regardless of the cause of the damage or loss, provided that such cause does not prevent payment of insurance proceeds to Landlord under the provisions of the applicable policy.
> . . . .
>
> 8. Insurance: Tenant shall maintain insurance in accordance with the provisions of subparagraphs (a) and (b) of this paragraph, and Tenant shall indemnify Landlord

in accordance with the provisions of sub-paragraph (c).

(a) Property Insurance: Tenant shall hold Landlord harmless for loss or damage by fire with regard to all of Tenant's furniture, fixtures, and equipment about or within the leased premises.

(b) Liability Insurance: Tenant shall provide and keep in force for the protection of the general public and Landlord liability insurance against claims for bodily injury or death upon or near the leased premises and the sidewalks, streets and service and parking areas adjacent thereto to the extent of not less than $500,000.00 in respect to bodily injuries or death to any one person and the extent of not less than $500,000.00 for bodily injuries or death to any number of persons arising out of one accident or disaster, and property damage with limits of not less than $100,000.00. The Tenant shall furnish Landlord with satisfactory evidence of such insurance within thirty (30) days of execution of this lease.

Despite the opening paragraph's language, Paragraph 8 contains no subparagraph (c).

In early 2012, the North Carolina Department of Agriculture and Consumer Services ("NCDA&CS") inspected the premises. The NCDA&CS determined the interior required modification to accommodate food production. The NCDA&CS particularly required "the open layout of the kitchen in Unit B–four conventionally framed walls exposed to the domed, steel roof trusses and insulation approximately 25 feet above–to be enclosed with an interior kitchen ceiling."

Plaintiffs and Hardin Creek agreed to extend the lease by five years. As part of this agreement, S. Greene agreed to modify the premises consistent with the NCDA&CS's requirements.[1] In addition to building a new kitchen ceiling, S. Greene raised the kitchen's interior walls so the new kitchen ceiling was level with the drying room's ceiling. S. Greene also lowered the sprinkler system's shower heads so they protruded through the new ceiling. S. Greene expanded the sprinkler system to cover the area over a walk-in cooler, and constructed a ladder to access the top of that cooler.[2]

On 7 January 2014, the temperature in Boone dropped into the single digits. The cold temperature froze the water in Plaintiffs' sprinkler system. Plaintiffs alleged the pipes froze because Defendants "created two separate heating zones between the newly enclosed kitchen and the open area above it, rendering the HVAC thermostat in the kitchen useless for regulating air temperature above the kitchen ceiling where the fire sprinkler system pipes were located." Plaintiffs also alleged

---

[1]The terms of the agreement to extend the lease do not include S. Greene's promise to modify the premises. However, in their answer to Plaintiffs' complaint, Defendants admit S. Greene "on behalf of Hardin Creek, arranged to have modifications made to the premises at Hardin Creek's expense[.]"

[2] Plaintiffs allege Hardin Creek, Timberframe, and S. Green were responsible for the modifications since each provided "construction and construction management services" to Plaintiffs.

Defendants' workers negligently left a vent near the apex of the roof open after performing repairs in December 2013.

Plaintiffs sought monetary damages for negligence and breach of the implied warranty of workmanlike performance against all Defendants. Plaintiffs also sought monetary damages for constructive eviction and breach of the covenant of quiet enjoyment against Hardin Creek, Inc. Finally, Plaintiffs alleged unfair and deceptive trade practices against S. Greene and Hardin Creek, Inc. Plaintiffs additionally sought treble damages and attorneys' fees under the unfair and deceptive trade practices claim, and sought punitive damages "as a result of Defendants' willful and wanton conduct and indifference to [Plaintiffs'] rights." Plaintiffs attached copies of the lease and the lease extension agreement to their complaint.

On 2 March 2015, Defendants answered Plaintiffs' complaint as moving to dismiss Plaintiffs' claims. Defendants contended the lease was only between Hardin Creek and Plaintiffs. Defendants therefore asked the trial court to dismiss Plaintiffs' claims against Timberframe and S. Greene pursuant to Rule 12(b)(6). Defendants also moved to dismiss Plaintiffs' negligence, constructive eviction, and unfair and deceptive trade practices claims pursuant to Rule 12(b)(6). Defendants asserted the following affirmative defenses: (1) Plaintiffs were contributorily negligent in leaving the roof vent open; (2) Plaintiffs' assumption of the risk; (3) Plaintiffs' failure to

mitigate damages; and (4) the damages were beyond the parties' reasonable expectation and are therefore barred by the economic loss doctrine.

In an order filed on 15 October 2015, the trial court set a case management conference and a discovery scheduling order ("scheduling order"). Both parties consented to the scheduling order which set the discovery deadline for 15 April 2015. The parties consented to an amended scheduling order on 25 January 2016. This amended scheduling order required the trial court to hear all dispositive motions not more than thirty days before the trial date, which the trial court set for the session beginning 6 June 2016.

On 8 March 2016, Defendants amended their answer and filed two counterclaims. First, Defendants alleged Plaintiffs negligently left the roof vent open and breached their duty to maintain the premises. Second, Defendants claimed breach of contract. Under this second claim, Defendants alleged the lease obligated Plaintiffs to pay for repairs or damage due to Plaintiffs' negligence. Defendants sought monetary damages for each of these claims.

*Opinion of the Court*

On 14 April 2016, Defendants moved for summary judgment.[3] Defendants contended the trial court should dismiss Plaintiffs' claims against Timberframe and S. Greene since only Hardin Creek was responsible for the premises' modifications. Defendants contended (1) the lease was only between Plaintiffs and Hardin Creek; (2) S. Greene only interacted with Plaintiffs on Hardin Creek's behalf, not Timberframe; and (3) any work Timberframe performed on the premises was done on Hardin Creek's behalf. Defendants also contended a lack of privity of contract to support Plaintiffs' claim against either Timberframe or S. Greene for breach of implied warranty of workmanlike performance. As to Plaintiffs' constructive eviction claim and breach of the covenant of quiet enjoyment claim, Defendants alleged Plaintiffs caused the flooding since Plaintiffs left the roof vent open. Also, Defendants alleged Plaintiffs quit the lease despite Hardin Creek's willingness to restore the premises within ninety days of the incident. Finally, Defendants contended the lease discharged Hardin Creek "from all claims and liabilities arising from or caused by any hazard covered by insurance . . . regardless of the cause of the damage or loss . . ." pursuant to Paragraph 5(b) of the lease.

---

[3] Defendants complied with the deadline for dispositive motions in the amended scheduling order.

On 15 April 2016, Plaintiffs filed a motion to amend their complaint to add E. Greene as a party defendant. Plaintiffs alleged negligence and breach of the implied warranty of workmanlike performance. Plaintiffs also alleged they learned through discovery E. Greene "operated and oversaw property management and supervised the construction activities on the property that [gave] rise to this lawsuit."

Also on 15 April 2016, Plaintiffs filed a motion to continue the hearings and to enlarge the scheduling order deadlines. Plaintiffs alleged Defendants purposely delayed discovery, and Plaintiffs were still taking depositions and reviewing transcripts. Plaintiffs contended Defendants' motion for summary judgment was "premature and prejudicial," and requested more time "to prepare and present their case" before the trial court heard arguments on the dispositive motions.

On 22 April 2016, Plaintiffs filed a third party complaint against E. Greene. This brought all five claims Plaintiffs alleged in their original complaint against E. Greene. On 25 April 2016, the trial court heard Plaintiffs' and Defendants' motions, as well as Plaintiffs' third party complaint. On 27 April 2016, the trial court granted summary judgment in favor of Defendants. The trial court found Plaintiffs presented "no plausible reasons why further discovery would shed any light on paragraph 5(b) in the Lease[.]" The trial court also found "paragraph 5(b) in the lease is not ambiguous and is a complete defense to the claims raised in the Complaint[.]"The

trial court also *sua sponte* granted summary judgment in favor of Plaintiffs as to Defendants' counter claims. The trial court dismissed Plaintiffs' third party compliant against E. Green with prejudice, and dismissed Plaintiffs' motions to amend and continue as moot.

On 20 May 2016, Plaintiffs filed notice of appeal. Plaintiffs appealed the trial court's 27 April 2016 order and "all rulings and statements of the trial court that contributed to, served as predicate for, or were encompassed by the foregoing Order, including all statements and rulings made in Court during the hearing held April 25, 2016, and decision communicated April 27, 2016, to not hold further hearings." Pursuant to Rule 10(c) of the Rules of Appellate Procedure, Defendants notified Plaintiffs and this Court of its intent to appeal the trial court's grant of summary judgment in favor of Plaintiffs on the counterclaim in the event this Court reverses the trial court's grant of summary judgment in favor of Defendants.

## II. Jurisdiction

Plaintiffs appeal a superior court's order in a civil action disposing of all the parties' issues. Therefore, this Court has jurisdiction pursuant to N.C. Gen. Stat. §§ 1-277(a) and 7A-27(b) (2016).

## III. Standard of Review

This Court reviews the trial court's grant of summary judgment *de novo*. *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008). This Court must review the record in the light most favorable to the non-movant and draw all inferences in the non-movant's favor. *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000). *See also Caldwell v. Deese*, 288 N.C. 375, 378, 218 S.E.2d 379, 381 (1975).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2016). A party opposing a motion for summary judgment must only establish the existence of a genuine issue of material fact, and it need not show it would prevail on the issue at trial. *In re Will of Edgerton*, 29 N.C. App. 60, 63, 223 S.E.2d 524, 526 (1976).

"Appellate review of a trial court's determination of whether a contract is ambiguous is *de novo*." *Barrett Kays & Assoc., P.A. v. Colonial Bldg. Co., Inc. of Raleigh*, 129 N.C. App. 525, 528, 500 S.E.2d 108, 111 (1998).

### IV. Analysis

Plaintiffs contend the trial court erred in granting summary judgment in favor of Defendants because the language of Paragraph 5(b) of the Lease is ambiguous. We agree.

This Court interprets the terms of a lease as it would any contract. *Martin v. Ray Lackey Enterprises, Inc.,* 100 N.C. App. 349, 354, 396 S.E.2d 327, 330 (1990) (citation omitted). "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." *State v. Philip Morris USA, Inc.*, 363 N.C. 623, 631, 685 S.E.2d 85, 90 (2009) (quoting *Lane v. Scarborough,* 284 N.C. 407, 409-10, 200 S.E.2d 622, 624 (1973)). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." *Walton v. City of Raleigh*, 342 N.C. 879, 881 467 S.E.2d 410, 411 (1996). This Court derives the intent of the parties from the contract as a whole, rather than from any particular term or paragraph. *Jones v. Casstevens,* 222 N.C. 411, 413-14*,* 23 S.E.2d 303, 305 (1942) ("Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety.") (citation and internal quotation marks omitted). "[I]f there is uncertainty as to what the agreement is between the parties, a contract is ambiguous." *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs.,* 362 N.C. 269, 273, 658 S.E.2d 918, 921 (2008). "When an agreement is ambiguous and the intention of the parties is unclear, interpretation of the contract is for the jury." *International Paper Co. v. Corporex Constructors, Inc.,* 96 N.C. App. 312, 317, 385 S.E.2d 553, 556 (1989).

Here, in granting summary judgment in favor of Defendants, the trial court exclusively relied on the lease's language. Specifically, the trial court found Paragraph 5(b) was unambiguous and functioned as a complete defense to Plaintiffs' claims. However, we conclude the text of the lease, when considered in its entirety, fails to clearly state the parties' intentions and is ambiguous.

Paragraph 5(b) states the landlord and tenant discharge each other from "all claims and liabilities arising from or caused by any hazard covered by insurance . . . regardless of the cause of the damage or loss, provided that such cause does not prevent payment of insurance proceeds to Landlord under the provisions of the applicable policy." Paragraph 8 then purports to define the type and amount of insurance Defendants required Plaintiffs to carry. Paragraph 8 also includes the terms under which Plaintiffs would indemnify Defendants for damages covered by insurance. However, Paragraph 8 is incomplete. The opening sentence of Paragraph 8 states "Tenant shall maintain insurance in accordance with the provisions of subparagraphs (a) and (b) of this paragraph, and Tenant shall indemnify Landlord in accordance with the provisions of sub-paragraph (c)." The text of subparagraphs (a) and (b) follow this sentence. Subparagraph 8(a), titled "Property Insurance," contains indemnification language and states Plaintiffs hold Hardin Creek harmless for damages or losses caused by fire to Plaintiffs' furniture, fixtures, and equipment.

Subparagraph 8(b), titled "Liability Insurance," defines the types and amounts of liability insurance Defendants required Plaintiffs to carry. There is not a Subparagraph 8(c).

Both Subparagraph 5(b) and Paragraph 8 refer to limits on Hardin Creek's liability under the lease. The incomplete construction of Paragraph 8 creates an ambiguity as to the type and amount of insurance Hardin Creek required of Plaintiffs. The incomplete construction of Paragraph 8 also creates an ambiguity relating to the scope of Subparagraph 5(b). The language the trial court relied on in Subparagraph 5(b) refers to any "hazard covered by insurance on the leased premises." However, when Subparagraph 5(b) is read in connection with Paragraph 8, the exact meaning of the term "covered by insurance" is ambiguous. It is unclear whether that term refers to hazards covered only by insurance coverage as required by the lease, or whether that term is modified by the language in the missing subparagraph on indemnification.

Because the lease is ambiguous, and because the interpretation of an ambiguous lease is a question for the jury, the trial court erred in granting summary judgment in favor of Defendant Hardin Creek, Inc.

Even if this Court concluded the lease was unambiguous, the trial court still incorrectly found Paragraph 5(b) served as a complete release from liability.

Generally, parties may contract to "bind themselves as they see fit" unless the contract violates the law or is against public policy. *Lexington Ins. Co. v. Tires Into Recycled Energy and Supplies, Inc.*, 136 N.C. App. 223, 225, 522 S.E.2d 798, 800 (1999) (quoting *Hall v. Sinclair Refining Co.*, 242 N.C. 707, 709-10, 89 S.E.2d 185 (1953)). "However, contracts which attempt to relieve a party from liability for damages incurred through personal negligence are discouraged and narrowly construed[.]" *Id.* at 225, 522 S.E.2d at 800 (citation omitted). "The contract will never be so interpreted [to exempt liability for negligence] in the absence of clear and explicit words that such was the intent of the parties." *Winkler v. Appalachian Amusement Co.*, 238 N.C. 589, 596, 79 S.E.2d 185, 190 (1953).

Here, the trial court ruled Paragraph 5(b) of the lease meant both parties intended to waive claims relating to any matter covered by insurance. Plaintiffs concede their insurance covered up to $60,000 for damages resulting from the flood. However, Plaintiffs contend they did not intend to waive claims for business losses not covered by insurance and caused by Defendants' negligence.

In *William F. Freeman, Inc. v. Alderman Photo Co.* this Court held a lease which only addresses insurance coverage and subrogation rights will not extend to exempt the parties from liability for negligence. 89 N.C. App. 73, 75, 365 S.E.2d 183, 185 (1988). There, the lease required the parties to insure their own property, and

this Court concluded the parties included the subrogation clause to ensure each party would only be required to pay for damages to his own property. *Id.* at 76, 365 S.E.2d at 185. This Court reasoned because the lease contained "no clear, explicit words waiving liability for negligence[,]" it would not infer the parties intended to do so. *Id.* at 76, 365 S.E.2d at 185.

This Court later distinguished the lease in *Freeman* in *Lexington* at 226, 522 S.E.2d at 800 (1999). In *Lexington*, this Court concluded the terms of the lease contained an explicit waiver by each party of its right to recover against the other for loss covered by insurance. *Lexington* at 226, 522 S.E.2d at 801. Additionally, this Court concluded the lease "clearly and explicitly evidences the intent of each of the parties to relieve the other from all liability . . . including liability for negligence." *Id.* at 227, 522 S.E.2d at 801.

Even though the lease in the instant case states the parties "agree and discharge each other from all claims and liabilities arising from or caused by any hazard covered by insurance," the lease does not explicitly state the parties contemplated to waive claims stemming from negligence. This Court will not infer the parties intended to exempt each other from liability for negligence where the lease does not contain specific language indicating the parties' intent to do so. *See Freeman* at 76, 365 S.E.2d at 185. Therefore, the trial court erred in interpreting Paragraph

5(b) as a complete release from all liability when that Paragraph did not contain language explicitly covering negligence.

In negligence cases, granting summary judgment is rare. Here the facts support a violation of a safety statute to wit: The pertinent provision of the North Carolina State Building Code states "[a]ll areas used for commercial or institutional food preparation and storage facilities adjacent thereto shall be provided with an automatic sprinkler system." N.C. Gen. Stat. § 143-138(m)(2) (2017). "[T]he [North Carolina State Building] Code imposes liability on any person who constructs, supervises construction, or designs a building or alteration thereto, and violates the [Building] Code such that the violation proximately causes injury or damage." *Lassiter v. Cecil*, 145 N.C. App. 679, 684, 551 S.E.2d 220, 223 (2001) (quoting *Olympic Products Co. v. Roof Systems, Inc.,* 88 N.C. App. 315, 329, 363 S.E.2d 367, 375 (1988)). "[A] violation of the North Carolina Building Code constitutes negligence *per se* because the Code is a statute to promote the safety of others." *Id.* at 684, 551 S.E.2d at 223. The owner of a building is not negligent *per se* for a violation of the North Carolina Building Code unless: "(1) the owner knew or should have known of the [Building] Code violation; (2) the owner failed to take reasonable steps to remedy the violation; and (3) the violation proximately caused injury or damage." *Lamm v. Bissette Realty, Inc.,* 327 N.C. 412, 415, 395 S.E.2d 112, 114 (1990).

Here, Plaintiffs alleged Defendants owed a duty to Plaintiffs "to inspect, construct, and alter the Premises in a workmanlike manner such that it would be . . . in accordance with local building codes, building plans, and industry standards." Plaintiffs also alleged "Defendants were warned that the insulation in the building was inadequate to properly protect the sprinkler systems during cold weather[.]" Finally, Plaintiffs alleged they suffered damages as a "direct and proximate cause" of Defendants' negligence. Based on our review of these pleadings, along with the provisions of the North Carolina Building Code, we conclude Plaintiffs sufficiently alleged negligence to survive Defendants' motion for summary judgment.

We now address this case's procedural posture in light of our ruling. First, we reverse the trial court's grant of summary judgment in favor of all Defendants as to Plaintiffs' negligence claims. "Negligence claims are rarely susceptible of summary adjudication, and should ordinarily be resolved by trial of the issues." *Lamb. v. Wedgewood South Corp.*, 308 N.C. 419, 425, 302 S.E.2d 868, 871 (1983). We cannot review or resolve the issue of the various Defendants' degree of involvement in modifying the sprinkler system from our record on appeal. This is an issue for the trial court which the trial court may be able to resolve upon motion for directed verdict.

Also, the trial court denied Plaintiffs' motion to amend their complaint to add E. Greene as a party defendant as a consequence of its order granting summary judgment in Defendants' favor. Because we reverse the trial court's order granting summary judgment as to Defendants, it follows the trial court should resolve and reconsider Plaintiffs' motion to add E. Greene as add a defendant to this action.

As to Defendants' counterclaims against Plaintiffs, Defendants' brief summarily addresses this issue as follows:

> Without diminishing the strength of Defendants' argument that the Exculpatory Clause is valid and enforceable and bars Plaintiffs' claims, Defendants, in the alternative, ask the Court to apply the Exculpatory Clause equally to both parties; and if the summary judgment in favor of Defendants is reversed, the Court should reverse the dismissal of the counterclaims."

Defendants fail to cite any legal authority or otherwise argue this issue.

Under our Rules of Appellate Procedure, "[t]he function of all briefs required or permitted by these rules is to define clearly the issues presented to the reviewing court and to present the arguments and authorities upon which the parties rely in support of their respective positions thereon." N.C. R. App. P. 28(a) (2017). "It is not the duty of this Court to supplement [a party's] brief with legal authority or arguments not contained therein." *Eaton v. Campbell*, 220 N.C. App. 521, 522, 725 S.E.2d 893, 894 (2012) (quoting *Goodson v. P.H. Glatfelter Co.,* 171 N.C. App. 596,

606, 615 S.E.2d 350, 358 (2005)). "Issues not presented and discussed in a party's brief are deemed abandoned." N.C. R. App. P. 28(a) (2017).

Here, Defendants fail to argue this issue and do not present this Court with a reason to disturb the trial court's order granting summary judgment in favor of Plaintiffs as to Defendants' counterclaims. Defendants have abandoned this issue on appeal, and we consequently affirm the trial court's ruling as to Defendants' counterclaims.

Finally, the trial court denied Plaintiffs' motion to continue and to enlarge discovery deadlines because the trial court found "no plausible reasons why further discovery would shed any light on paragraph 5(b) in the Lease." However, because this Court disagrees with the trial court's interpretation of Paragraph 5(b), the trial court should, on remand, consider setting a new discovery schedule pursuant to Rule 26 to allow the parties to complete their discovery.

Based on the foregoing, we reverse the trial court's order of summary judgment and remand this action with instructions for the trial court to proceed consistently with this opinion.

REVERSED AND REMANDED.

Judge CALABRIA concur.

*Opinion of the Court*

Judge BERGER dissents in a separate opinion.

BERGER, Judge, dissenting in separate opinion.

I respectfully dissent from the majority's opinion reversing the trial court's order and remanding for further proceedings. The trial court properly granted summary judgment in favor of Defendants as Paragraph 5(b) (the "Exculpatory Clause") of the lease is unambiguous and operates as a complete defense to the claims raised by Plaintiffs.

"[W]hen the language of a contract is plain and unambiguous, construction of the language is a matter of law for the court." *Mountain Fed. Land Bank v. First Union Nat. Bank*, 98 N.C. App. 195, 200, 390 S.E.2d 679, 682 (1990) (citation omitted). "The heart of a contract is the intention of the parties, which is to be ascertained from the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time." *Gould Morris Elec. Co. v. Atl. Fire Ins. Co.*, 229 N.C. 518, 520, 50 S.E.2d 295, 297 (1948) (citation omitted). "[W]hen the language of the contract and the intent of the parties are clearly exculpatory, the contract will be upheld." *Gibbs v. Carolina Power & Light Co.*, 265 N.C. 459, 467, 144 S.E.2d 393, 400 (1965) (citation omitted). Therefore, this Court construes the parties' contractual intent from the time of the writing as preserved in the contract and their actions. *See Mountain Fed. Land Bank,* 98 N.C. App. at 200, 390 S.E.2d at 682.

*BERGER, J., dissenting*

There is no question that leases

> which attempt to relieve a party from liability for damages
> incurred through personal negligence are discouraged and
> narrowly construed; any clause in a lease attempting to do
> so must show that this is the intent of the parties by clear
> and explicit language.

*Lexington Ins. Co. v. Tires Into Recycled Energy & Supplies, Inc.*, 136 N.C. App. 223, 225, 522 S.E.2d 798, 800 (1999) (citation omitted).

In *Winkler v. Appalachian Amusement Co.*, 238 N.C. 589, 79 S.E.2d 185 (1953), the defendant contended it was relieved of liability for negligence pursuant to the terms of a commercial real estate lease with the plaintiff that provided, in relevant part:

> [Paragraph 3]: The lessees . . . shall, at their own cost and
> expense, make any and all repairs that may be necessary
> inside the portion of the building hereby demised,
> excepting in case of destruction or damage by fire or other
> casualty, as set forth in Paragraph Six hereof.

> [Paragraph 6]: The lessors agree to keep said theater
> buildings, and the equipment hereby leased, insured to the
> extent of its full insurable value in some reliable insurance
> company. In event the premises or property hereby leased

2

*BERGER, J., dissenting*

> shall at any time during the operation and continuance of this lease be damaged or destroyed by fire or other casualty, the lessors shall thereupon and forthwith repair and restore said premises and property to the same condition in which they were before the happening of such fire or other casualty.

*Id.* at 592, 79 S.E.2d at 188 (internal quotation marks omitted).[4] Our Supreme Court held this language was insufficient to shield defendant from liability for damage caused by its own negligence. *Id.* at 598, 79 S.E.2d at 192. The Court noted, "[i]f the parties intended such a contract, we would expect them to so state in exact terms." *Id.* at 596, 79 S.E.2d at 191.

Similarly, as the majority here correctly states, this Court found no such clear, explicit waiver of liability for negligence in *William F. Freeman, Inc. v. Alderman Photo Co.*, 89 N.C. App. 73, 365 S.E.2d 183 (1988). The lease at issue in *Freeman* contained the following relevant language:

> INSURANCE: The Lessor shall carry, pay the premium, and be responsible for fire and extended coverage insurance upon the premises. In the event any improvements or

---

[4] The lease provisions were listed in the facts section found prior to the opinion. The opinion did not fully cite the provisions, but referenced the paragraph numbers and summarized the provisions.

3

alterations are made by the Lessee as provided hereinafter, the amount of such insurance shall be increased, following receipt, by Lessor, of written notice from Lessee, to such an extent as to cover said improvements and alterations. Unless the additional insurance coverage is increased to cover any improvements and alterations as aforesaid, the Lessor shall not be responsible for the replacement or restoration in the event of other casualty.

The Lessee shall carry, pay the premiums, and be responsible for fire insurance and other insurance upon its property, contents and equipment and shall carry adequate and sufficient liability insurance for both the Lessee and Lessor and shall furnish the Lessor evidence of such coverage.

The Lessee will not do, suffer or permit anything to be done in or about the premises that will affect, impair or contravene any policies of insurance against the loss or damage by fire, casualty or otherwise that may be placed thereon by the Lessee or the Lessor.

All insurance policies shall be in the name of the Lessor and Lessee as their interests may appear. All insurance, whether carried by the Lessor or the Lessee, shall provide a waiver of subrogation against the other party[.]

*Id.* at 75, 365 S.E.2d at 185 (internal quotation marks omitted). This Court stated that the lease terms "contain[ed] no clear, explicit words waiving liability for negligence as required by *Winkler*." *Id.* at 76, 365 S.E.2d at 185.

However, this Court previously enforced a commercial real estate lease which included a broad exculpatory clause to prevent substantial damages. *See Hyatt v. Mini Storage on the Green,* 236 N.C. App. 278, 763 S.E.2d 166 (2014) (enforcing an exculpatory clause that protected against "any personal injuries" sustained on landlord's premises).[5] In *Hyatt*, the contractual language read as such:

> Landlord shall not be liable to tenant and/or tenant[']s guest or invitees for any personal injuries sustained by tenant and/or tenant[']s guest or invitees while on or about landlord's premises.

*Id.* at 282, 763 S.E.2d 169 (brackets omitted). This Court found this language constituted an exculpatory clause which "clearly and explicitly provides that

---

[5] Commercial lessors are justified in including exculpatory clauses because "water damage to merchandise may run to substantial amounts. For this reason[,] landlords tend to include the broadest exculpatory clause that will be enforced." MILTON R. FRIEDMAN, FRIEDMAN ON LEASES 1181 (4th ed. 1997).

[defendant] would not be liable for personal injuries sustained on the premises." *Id.* at 282-83, 763 S.E.2d at 170.

Further, in *Lexington*, this Court enforced a clause requiring the lessee to maintain insurance and waiving their rights to recovery. *Lexington*, 136 N.C. App at 227, 522 S.E.2d at 801. In *Lexington*, the subrogation agreement stated:

> 18. Waiver of Subrogation. Each party, notwithstanding any provision of this Lease otherwise permitting such recovery, *hereby waives any rights of recovery against the other for loss or injury against which such party is protected by insurance*, to the extent of the coverage provided by such insurance. Each insurance policy carried by either party with respect to the Leased Premises or the property of which they are a part which insures the interest of one party only, shall include provisions denying to the insurer acquisition by subrogation of any rights of recovery against the other party. The other party agrees to pay any additional resulting premium.

*Id.* at 223-24, 522 S.E.2d at 799 (emphasis added). This Court found the subrogation clause "plain and unambiguous" as both parties "agreed to include a subrogation waiver clause in any insurance policies . . . which covered the leased premises." *Id.* at 226-27, 522 S.E.2d at 801.

6

Conversely, in *Winkler*, the parties lacked contractual intent while the lease lacked a subrogation clause, and *Freeman* only required the parties to protect against damages to their own property. Commercial real estate leases which "clearly and explicitly evidence[] the intent of each of the parties to relieve the other from all liability for damages otherwise covered by insurance, including liability for negligence" are enforceable. *Lexington*, 136 N.C. App at 227, 522 S.E.2d at 801.

In the case *sub judice*, the parties clearly and explicitly waived all claims, including claims for negligence. The relevant portion of the Exculpatory Clause reads:

> [N]otwithstanding any other provision of this lease to the contrary, Landlord and Tenant and all parties claiming under them agree and discharge each other *from all claims and liabilities arising from or caused by any hazard covered by insurance on the leased premises*, or covered by insurance in connection with the property owned or activities conducted on the leased premises, *regardless of the cause of the damage or loss . . . .*

(Emphasis added).

The Exculpatory Clause shields Defendants from liability for "all claims and liabilities arising from or caused by any hazard covered by insurance on the leased

7

premises . . . regardless of the cause of the damage or loss." Similar to *Lexington*, the Exculpatory Clause clearly and explicitly operates as a waiver of negligence for *any* liability on the leased premises.

Additionally, Paragraph 8 of the lease required Plaintiffs to possess both property and liability insurance in clear and unambiguous terms. *Cf. New River Crushed Stone, Inc. v. Austin Powder Co.,* 24 N.C. App. 285, 210 S.E.2d 285 (1974) (validating an indemnification clause where the contract (1) involved private parties, (2) did not violate public policy, and (3) did not result from any gross inequality in bargaining power).[6] Including an insurance requirement is evidence of the parties' intent to relieve the other from any liability or damages, including damages related to negligence.

It is not within this Court's discretion to redraft a private commercial real estate lease that is not contrary to public policy. Because the clear and unambiguous

---

[6] It is in the best interest of the tenant to seek insurance because "the likelihood of getting [a broad exculpatory clause] changed is slight. In these circumstances[,] the tenant should be protected by *adequate insurance*." MILTON R. FRIEDMAN, FRIEDMAN ON LEASES 1181 (4th ed. 1997) (emphasis added).

*BERGER, J., dissenting*

language of this commercial lease precludes recovery by Plaintiffs, I would affirm the trial court's entry of summary judgment.